

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| ANN McGRUDER, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD83719 |
| | ) | |
| CURATORS OF THE | ) | FILED: January 19, 2021 |
| UNIVERSITY OF MISSOURI, | ) | |
| Respondent. | ) | |

**Appeal from the Circuit Court of Boone County
The Honorable Kevin Crane, Judge**

**Before Division One: Alok Ahuja, P.J., and
Thomas H. Newton and Thomas N. Chapman, JJ.**

Ann McGruder sued the Curators of the University of Missouri (the "University") in the Circuit Court of Boone County, alleging sex discrimination and retaliation in employment. The circuit court entered judgment on the pleadings in favor of the University, finding that McGruder had released it from liability. McGruder appeals. She argues that the pleadings presented disputed factual issues concerning whether the release on which the University relied was the product of a mutual mistake by the contracting parties. We agree that the circuit court should not have resolved McGruder's mutual mistake claim based solely on the pleadings. We accordingly reverse the circuit court's judgment, and remand for further proceedings.

## Factual Background

Because this appeal involves the grant of judgment on the pleadings, we presume that the following facts alleged in the pleadings are true for purposes of

our review. *See State Conference of Nat'l Ass'n for Advancement of Colored People v. State*, 563 S.W.3d 138, 142 n.2 (Mo. App. W.D. 2018).

From May 2001 through January 2018, McGruder was employed at the University of Missouri-Columbia. McGruder began working in the School of Medicine in August 2016, as the Associate Director of Administration in the Department of Surgery at the Ellis Fischel Cancer Center. While in this position, McGruder alleges she was subjected to sex discrimination and retaliation.

When she was terminated as part of a "departmental reorganization," the University offered McGruder the opportunity to participate in its Layoff and Transition Assistance program. Participating in this program would have provided McGruder with severance pay and continued access to certain employee benefits. To participate, McGruder would have been required to release any employment-related claims against the University, including claims under the Missouri Human Rights Act. Because she believed she had been the victim of sex discrimination and retaliation in her employment with the University, McGruder refused to execute the release and therefore did not participate in the Layoff and Transition Assistance program.

McGruder filed a charge of discrimination with the Missouri Human Rights Commission on July 2, 2018, in which she alleged that she had been discriminated against in her employment with the University on the basis of her age and sex, and that she had also been the victim of unlawful retaliation.

In January 2018, McGruder accepted a position with the Alfred Friendly Foundation, a not-for-profit corporation physically located within the University of Missouri-Columbia's School of Journalism. The Foundation is an independent legal entity, and is neither owned nor controlled by the University.

Some of the Foundation's staff were joint employees of the Foundation and of the University, with part of their salary being paid by each institution. McGruder

2

worked exclusively for the Foundation, however, and was paid exclusively by the Foundation. The Foundation provided McGruder with the same level of employee benefits she had received while employed by the University, and it recognized her accumulated annual leave from her prior University employment. The Foundation outsourced its payroll and employee benefits administration to the University, much like a third-party human resources vendor. McGruder thus received her paychecks and benefits through the University system, but her salary and benefits were paid exclusively from the Foundation's budget.

In the Fall of 2018, McGruder met with the Foundation's Chief Executive Officer, Randy Smith, and with several members of the Foundation's Board. Smith and the Board members informed McGruder that the Foundation was experiencing financial difficulties. They told McGruder that, if the Foundation ceased its operations, McGruder would likely be laid off, since she was not a joint University employee, but was paid and employed exclusively by the Foundation. Smith and the Board members told McGruder that if her employment was terminated, the Foundation would pay her severance benefits similar to what the University paid its employees, and that they would calculate her severance based on McGruder's tenure both with the Foundation and with the University. McGruder was told that the Foundation was setting aside $40,000 out of its budget to pay her severance benefits.

McGruder was laid off by the Foundation in March 2019. Smith told McGruder that she would receive her full severance benefits in exchange for her release of the Foundation from any claims she might have. Smith contacted human resources personnel at the University and requested a standard severance contract that he could use for McGruder. He received a document entitled "University of Missouri Layoff and Transition Assistance Agreement." This was the same document which the University had requested that McGruder sign in 2018, and

which she had refused to execute. The standard-form agreement was written as if McGruder's employment *with the University* were being terminated; it made no reference to the Foundation, or to the fact that McGruder was a full-time Foundation employee at the time she executed the agreement. The severance agreement stated that the University would provide McGruder with severance pay and benefits, and that in exchange McGruder would release any employment-related claims she had against the University, including any claims under the Missouri Human Rights Act.

McGruder signed the severance agreement on March 1, 2019.

In April 2019, the Missouri Human Rights Commission issued McGruder a right to sue letter concerning her discrimination and retaliation claims against the University. McGruder sued the University for sex discrimination and retaliation in the Circuit Court of Boone County on July 19, 2019.

In addition to answering McGruder's petition, the University filed a counterclaim, seeking specific performance of the severance agreement which McGruder had signed on March 1, 2019. The University contended that the severance agreement had the effect of releasing it from McGruder's claims of sex discrimination and retaliation.

On November 6, 2019, the University filed a Motion for Judgment on the Pleadings on its counterclaim, alleging that it was entitled to judgment as a matter of law because the plain language of the severance agreement released the University from liability to McGruder for any employment-related claims.

In response to the University's Motion for Judgment on the Pleadings, and with leave of court, McGruder filed an Amended Reply to the University's counterclaim on March 6, 2020. In her Amended Reply, McGruder admitted that she had executed the severance agreement in March 2019. The Amended Reply alleged, however, that when she signed the severance agreement it was McGruder's

4

understanding, and the understanding of the Foundation's Chief Executive Officer Randy Smith, that the severance agreement was entered only between McGruder and the Foundation; that the Foundation was the only entity which would be paying severance and benefits to McGruder; that the Foundation was the only entity which would be released of liability by the severance agreement; and that the severance agreement had no effect on any claims McGruder may have against the University for her prior employment with the University. McGruder alleged that the University was not a beneficiary of the release contained in the severance agreement and was not entitled to enforce that release, based on the affirmative defenses of mutual mistake, lack of standing, and unilateral mistake coupled with fraud and unclean hands on the part of the University.[1]

On March 16, 2020, the circuit court held a hearing, and sustained the University's Motion for Judgment on the Pleadings. The court dismissed McGruder's claims of sex discrimination and retaliation.

McGruder appeals.

### Standard of Review

A circuit court's ruling on a motion for judgment on the pleadings is reviewed *de novo*. *Woods v. Mo. Dep't of Corr.*, 595 S.W.3d 504, 505 (Mo. 2020). "The position of a party moving for judgment on the pleadings is like that of a movant on a motion to dismiss; *i.e.*, assuming the pleaded facts to be true, the facts are, nevertheless insufficient as a matter of law." *Barrett v. Greitens*, 542 S.W.3d 370, 376 (Mo. App. W.D. 2017) (citation omitted). "A motion for judgment on the pleadings should be

---

[1] Along with her Amended Reply, McGruder attempted to file a Third-Party Petition against the Foundation, in which she sought reformation of the severance agreement based on a mutual mistake between herself and the Foundation, or alternatively, rescission based on a unilateral mistake. McGruder did not obtain leave of court to file her Third-Party Petition, and she acknowledges that she did not effect service on the Foundation prior to the circuit court's entry of final judgment.

sustained if, from the face of the pleadings, the moving party is entitled to judgment as a matter of law." *Woods*, 595 S.W.3d at 505 (citation and internal quotation marks omitted). "Before a motion for judgment on the pleadings may be granted, all averments in all pleadings must show no material issue of fact exists; that all that exists is a question of law." *RGB2, Inc. v. Chestnut Plaza, Inc.*, 103 S.W.3d 420, 424 (Mo. App. S.D. 2003) (citation omitted).

## Discussion

McGruder argues that judgment on the pleadings was improper because she properly pleaded an affirmative defense of mutual mistake. McGruder's affirmative defense alleges that, to the extent the severance agreement purports to release employment-related claims she may have against the University, that result was not intended by McGruder or by the Foundation (whom she claims were the only parties to the severance agreement). McGruder contends that her affirmative defense created a material factual dispute concerning an issue which would bar enforcement of the release.

A "[m]utual mistake exists when both parties have memorialized in writing what neither actually intended." *Cardinal Partners, LLC v. Desco Inv. Co.*, 301 S.W.3d 104, 110 (Mo. App. E.D. 2010) (citation omitted). Though an "extraordinary equitable remedy," a party to a contract may be entitled to reformation where, due to a mutual mistake, "the writing fails to accurately set forth the terms of the actual agreement or fails to incorporate the true prior intentions of the parties." *Lunceford v. Houghtlin*, 170 S.W.3d 453, 464 (Mo. App. W.D. 2005) ("*Lunceford I*") (quoting *Elton v. Davis*, 123 S.W.3d 205, 212 (Mo. App. W.D. 2003)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 155 (1981). Relief should be granted for a mutual mistake where "a written instrument fails to express the intention the parties had in making the contract that the instrument purports to contain . . . although the

6

failure may have resulted from a mistake as to the legal meaning and operation of the terms or language used in the writing." *Cardinal Partners*, 301 S.W.3d at 110.

Whether a mutual mistake occurred is normally a question of fact. *Husch & Eppenberger, LLC v. Eisenberg*, 213 S.W.3d 124, 134 (Mo. App. E.D. 2006); *accord Brown v. Mickelson*, 220 S.W.3d 442, 448 (Mo. App. W.D. 2007). In determining whether a mutual mistake occurred, a court may consider such factors as "the wording of the contract as signed by the parties, the relationship of the parties, the subject matter of the contract, the usages of the business, the circumstances surrounding the execution of the contract, and its interpretation by the parties." *Traweek v. Smith*, 607 S.W.3d 779, 786 (Mo. App. W.D. 2020) (quoting *Lunceford v. Houghtlin*, 326 S.W.3d 53, 64 (Mo. App. W.D. 2010) ("*Lunceford II*")).

In showing "a valid prior agreement evidencing a meeting of the minds," "[t]he party . . . need not show agreement on any particular words or language but must only show agreement to accomplish a particular objective." *Everhart v. Westmoreland*, 898 S.W.2d 634, 637 (Mo. App. W.D. 1995) (citations omitted). "In order to show a mistake in an instrument, it is sufficient that the parties agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention." *US Bank, N.A. v. Smith*, 470 S.W.3d 17, 25 (Mo. App. W.D. 2015) (citation and internal quotation marks omitted). The mistake may be proved by circumstantial evidence, as well as by statements and conduct of the parties that occurred after the making of the written instrument. *Lunceford II*, 326 S.W.3d at 64, 67.

A contracting party may assert mutual mistake even if the language of the written agreement is clear and unambiguous. *Duenke v. Brummett*, 801 S.W.2d 759, 765 (Mo. App. S.D. 1991) ("the remedy is not barred by the fact that the instrument sought to be reformed is unambiguous"; collecting cases). The University itself acknowledges that, while "[a] plain and unambiguous release will

7

be enforced as written," "a party to such a release may be able to avoid enforcement by showing that the agreement was based on a mutual mistake."

A contracting party may rely on extrinsic evidence to establish that a mutual mistake occurred, notwithstanding the parol evidence rule, or the existence of a merger or integration clause in the agreement. The rationale is that in the context of a mutual mistake argument, "[p]arol or extrinsic evidence is not received for the purpose of varying the contract of the parties" – which the parol evidence rule prohibits – but is instead used "to show what their contract really was. The thing being reformed is the writing, not the contract." *Duenke*, 801 S.W.2d at 766; *see also CMI Food Serv., Inc. v. Hatridge Leasing*, 890 S.W.2d 420, 422-23 (Mo. App. W.D. 1995) ("a contract may be reformed if substantial evidence, including parol evidence, establishes a scrivener's mistake – even if the contract is unambiguous").

McGruder properly pleaded the affirmative defense of mutual mistake in her Amended Reply to the University's counterclaim. To adequately plead her affirmative defense, McGruder was only required to provide "a short and plain statement of the facts showing that [she] was entitled to the defense or avoidance." Rule 55.08. McGruder satisfied this pleading burden. She alleged that the severance agreement was intended to memorialize an agreement which was solely between her and the Foundation, in connection with the termination of her employment with the Foundation. McGruder alleged that she and the Foundation's Chief Executive Officer both contemplated that severance benefits would be paid solely by the Foundation, that McGruder would release claims only against the Foundation, and that the agreement would have no effect on McGruder's pending discrimination and retaliation claims against the University. She also alleged that the mistake arose because the Foundation's Chief Executive Officer requested a standard-form severance agreement from the University, but failed to modify that form to reflect the agreement McGruder and the Foundation had actually reached.

8

The fact that McGruder went forward with her sex discrimination suit against the University after signing the release also supports her mistake claim. *See Lunceford II*, 170 S.W.3d at 64, 67.[2]

McGruder's allegations were sufficient to put in issue whether the written severance agreement inaccurately memorialized the agreement she reached with the Foundation, despite its clear language. This was sufficient to raise a "mutual mistake" defense. *See Lunceford II*, 326 S.W.3d at 64-65 (finding sufficient evidence of mutual mistake where settlement agreement between injured parties and insurer was not intended to release the injured parties' claims against the alleged tortfeasors); *Everhart*, 898 S.W.2d at 638-39 (finding sufficient evidence of mutual mistake where parties to settlement agreement did not intend that general release would operate to extinguish liability of an additional alleged tortfeasor).

The University argues that McGruder failed to adequately plead a mutual mistake claim because her "defense was not based on a mistake that allegedly was shared by her and the University, the two parties to the plain, unambiguous Transition Assistance Agreement. Instead, McGruder pleaded an alleged mistake between her and the Foundation, which McGruder identifies as a 'third party.'" The University contends that, to be *mutual*, the mistake must be shared by "'both contracting parties,'" meaning "'both parties to the instrument.'"

The University's argument begs the question. It assumes that the parties to the severance agreement were McGruder *and the University*. The University's argument is contrary to the fundamental premise underlying McGruder's mutual mistake claim: that the University is _not_ a party to the relevant agreement, but

---

[2]     A fact-finder could also conclude that it would have been unusual for the Foundation to insist that McGruder execute a severance agreement releasing claims against a separate legal entity (but not claims against the Foundation itself), as a condition for her to receive severance benefits *from the Foundation*.

9

was mistakenly named in the writing which memorializes her agreement. McGruder alleges that her agreement was with *the Foundation*, <u>not</u> the University. McGruder seeks to vindicate the terms of her true agreement with the Foundation, and to avoid the consequences flowing from the writing which imperfectly records this agreement. According to the allegations of McGruder's Amended Reply (which we must assume to be true for purposes of this appeal), only her intent, and that of the Foundation, are relevant to her "mutual mistake" claim. According to McGruder's allegations, *the University*'s intent is irrelevant, since it is a stranger to the agreement, on whom neither McGruder nor the Foundation intended to confer any benefit.

The University claims that *Silver Dollar City, Inc. v. Kitsmiller Construction Co.*, 931 S.W.2d 909 (Mo. App. S.D. 1996), holds that alleged mistakes concerning the identity of a contracting party can only be addressed as a matter of *unilateral* mistake. In *Silver Dollar City*, one of the contracting parties claimed that it had only executed a contract because it understood that it was contracting with <u>two</u> construction companies operating as a joint venture – even though only one of the two construction companies actually signed the contract and intended to be bound. *Id.* at 915. Thus, in *Silver Dollar City*, the contracting party alleged that it was mistaken *as to the party with which it was contracting*.

Here, by contrast, McGruder does not contend that she was mistaken as to the identity of the other contracting party. She alleges that she entered into a severance agreement with *the Foundation*, in connection with the termination of her employment with *the Foundation*. Rather than alleging a mistake as to the identity of a contracting party, McGruder alleges a mutual mistake as to the manner in which a contracting party's identity *was expressed in the writing she executed*. This is a fundamentally different claim from that presented in *Silver Dollar City*. In addition, *Silver Dollar City* discussed the unilateral mistake

10

doctrine because that was the doctrine invoked by one of the contracting parties in that case. Nothing in the decision suggests that a claim that a writing incorrectly names the true contracting parties can *only* be addressed as a matter of unilateral mistake.

The University also relies on RESTATEMENT (SECOND) OF CONTRACTS § 153, comment g, to argue that a mistake as to the identity of a contracting party can be addressed only as an issue of unilateral mistake. But the University's reliance on § 153, comment g, is misguided for much the same reason as its reliance on *Silver Dollar City*. Like *Silver Dollar City*, § 153, comment g, of the RESTATEMENT addresses "[m]istakes as to the identity of a party." But again, McGruder does not allege such a mistake; she instead alleges a mistake concerning the manner in which a contracting party was identified in the written memorialization of the agreement. The RESTATEMENT clearly distinguishes between mistakes as to underlying facts (such as the issue addressed in § 153), and mistakes in the written expression of the parties' agreement (such as we have here). *See* Introductory Note to ch. 6.

In addition, the comment on which the University relies itself states:

> Mistakes as to the identity of a party have sometimes been treated as distinct from other mistakes, but the modern trend is to apply the rules applicable to other mistakes. Such a mistake is therefore subject generally to the rules stated in this Chapter.

§ 153, comment g. And among "the rules stated in this Chapter" is § 155, which provides:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Comment a to § 155 explains:

11

The province of reformation is to make a writing express the agreement that the parties intended it should. Under the rule stated in this Section, reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression – one that relates to the contents or effect of the writing that is intended to express their agreement – and the appropriate remedy is reformation of that writing properly to reflect their agreement.

Nothing in the RESTATEMENT forecloses the mutual mistake claim which McGruder makes here.

We recognize that the entity which McGruder claims is the other party to the severance agreement – the Foundation – is not a party to this action. We specifically held in *Lunceford II*, however, that the presence of the other party to a disputed release was not required. Instead, we explained that the injured party could raise a mutual mistake claim "as a part of their defense of [the defendant's] affirmative defense of release." 326 S.W.3d at 60 n.4. That is exactly what McGruder has done here: she raised the mutual mistake issue as a defense against the University's claims that McGruder has released it from liability. While McGruder may seek leave of the circuit court on remand to implead the Foundation, such impleader is not required.[3]

Because McGruder's pleadings raised a genuine factual dispute concerning the applicability of the release to her claims against the University, the circuit court erred in granting the University judgment on the pleadings based on that release.

---

[3] Notably, in the circuit court, the University resisted McGruder's attempt to add the Foundation as a party, arguing that McGruder was not asserting a "proper third party claim[ ]," because her "reformation claim is a defense to [the University's] enforcement of the agreement. It's not an affirmative claim against [the] Foundation."

## Conclusion

We reverse the circuit court's grant of judgment on the pleadings to the University, and remand the case for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

All concur.